## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **DONNAH NICKERSON-RETI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil No.** |
| **v.** | ) | **13-12316-FDS** |
| | ) | |
| **BANK OF AMERICA, N.A., successor** | ) | |
| **by merger to BAC HOME LOANS** | ) | |
| **SERVICING, LP,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
## FOR LEAVE TO FILE AND DEFENDANT'S MOTION TO DISMISS

**SAYLOR, J.**

This is a dispute arising out of the denial of a mortgage-loan modification. On June 22, 2007, plaintiff Donnah Nickerson-Reti obtained a mortgage loan of $417,000. She secured the loan with a mortgage on her home in Lexington, Massachusetts. Defendant Bank of America, N.A., was the servicer of her mortgage loan.[1]

Nickerson-Reti applied for and was denied a mortgage-loan modification twice; once in 2009 and once in 2012. On August 16, 2013, she brought suit against defendant for claims arising out of her loan-modification applications and denials. On December 30, 2013, she amended her original complaint. The amended complaint alleges claims of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and

---

[1] Although this case is brought against BANA as successor to BAC Home Loans Servicing, LP, the proposed amended complaint alleges that BAC is a subsidiary of BANA.

violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2.

On February 12, 2014, defendant moved to dismiss the amended complaint. On April 23, 2014, Nickerson-Reti moved for leave to file a further amended complaint. The proposed amended complaint alleges breach of fiduciary duty (Count 1); two claims of breach of contract (Counts 2 and 3); breach of the implied covenant of good faith and fair dealing (Count 4); promissory estoppel (Count 5); violations of Chapter 93A (Count 6); violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* (Count 7); violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Fair Housing Act, 42 U.S.C. § 3604 *et seq.* (Count 8); fraud (Count 9), and unjust enrichment (Count 11).[2]

For the following reasons, plaintiff's motion to amend will be granted in part and denied in part, and defendant's motion to dismiss will be denied as moot.

## I.  Background

### A.  Factual Background

 The facts are set forth in the proposed amended complaint unless otherwise noted.

#### 1.  Nickerson-Reti's Mortgage Loan

Donnah Nickerson-Reti was formerly a resident of Massachusetts, and is now a resident of California.

Bank of America, N.A., is a federally chartered banking institution headquartered in North Carolina. BAC Home Loans Servicing, LP, is a subsidiary of BANA.

On June 22, 2007, Nickerson-Reti obtained a mortgage loan from BANA in the amount

---

[2] The proposed amended complaint skips Count 10.

of $417,000.  The loan was secured by her home in Lexington, Massachusetts.  Under the terms

of the mortgage loan, Nickerson-Reti was obligated to make monthly payments of $2,400.49.

While the mortgage contract required her to pay BANA additional payments for escrow items

such as taxes and insurance, BANA waived those payments as long as Nickerson-Reti dealt with

them herself.

In February 2009, the Secretary of the Treasury established the Home Affordable

Modification Program ("HAMP"), a federal initiative designed to provide incentives for lenders

to agree to modification of home loan agreements in lieu of foreclosure.  The goal of HAMP was

to provide relief to borrowers who have defaulted or are likely to default by reducing mortgage

payments to sustainable levels, without discharging any of the underlying debt.  *See* U.S. Dep't

of the Treasury, Supplemental Directive 09-01, *available at* https://www.hmpadmin.com/portal/

programs/docs/hamp_servicer/sd0901.pdf.  Under HAMP, participating loan servicers were

provided with incentive payments for each permanent mortgage-loan modification completed.

*Id.* at 23.  These modifications proceeded under a uniform process designed to identify eligible

borrowers and render their debt obligations more affordable and sustainable.  *Id.* at 1.

In its advertising materials, BANA offered to assist homeowners with counseling and

loan modifications to help them make their mortgage payments and keep their homes.  This

assistance included the possibility of a HAMP loan modification.

In early 2009, Nickerson-Reti believed that she may have trouble keeping up with her

mortgage payments in the near future.  On March 4, 2009, she called BANA to apply for a

HAMP loan modification.  A BANA employee told her she could not apply for a HAMP

modification because she had not missed any of her mortgage payments.  According to her, on

April 13, 2009, a BANA employee "strongly advised [her] that the best way to get any help from [BANA] was to skip making at least two [mortgage] payments." (Proposed Am. Compl. ¶ 18).

Nickerson-Reti subsequently missed two mortgage payments, but attempted to make two payments toward the principal on her loan in April and May of 2009. Instead of applying those payments to her loan's principal, BANA treated them as partial mortgage payments. It sent her a letter on May 12, 2009, stating she must pay an additional $900.49 by June 1, 2009, or the partial payment would be returned. Nickerson-Reti resumed her regularly scheduled payment of $2,400.49 in June.

### 2. Application for a HAMP Modification

On April 14, 2009, Nickerson-Reti faxed an application for a HAMP loan modification to BANA. The bank responded on April 29, requesting additional documentation. She supplied the requested documents within seven days. BANA sent her two letters, one on May 12 and one on May 18, informing her that it had received those documents and that it would provide a decision on her request within ninety days.

Over the next six months, Nickerson-Reti received several form letters and offers from BANA concerning the HAMP program. She called the bank several times to inquire about the status of her application, but did not receive a clear answer.

On October 27, 2009, Nickerson-Reti called BANA and spoke to an employee named Ann Marie Stolle. According to Nickerson-Reti, Stolle told her that she was in default on her mortgage, and that sending BANA a check for $900.49 would cure the default. Stolle also told her that an employee named Patrick was working on her HAMP application. Nickerson-Reti paid the $900.49 to BANA.

On November 4, 2009, BANA sent Nickerson-Reti a letter stating that she was in default on her mortgage and that the loan would be accelerated unless she cured the default by February 2, 2010. At the time, she had not yet received a decision on her request for a HAMP modification. According to her, when she called BANA, an employee named Brendon told her that her application was still being processed and told her to ignore the foreclosure letter. He also told her "it's no big deal if it goes into foreclosure; Patrick can change that." (Proposed Am. Compl. ¶ 35). In November 2009, she received three foreclosure notices from BANA, each with a different default amount and cure date.

On November 11, 2009, she received a check for $1,109.95, which BANA said was the return of a partial mortgage payment. She had never sent BANA a payment for that amount.

On December 6, 2009, she sent updated HAMP documents to BANA. She made several calls to BANA in December, but received no helpful information.

### 3.　　The Trial Period Plan

On December 22, 2009, Nickerson-Reti called BANA and spoke to an employee who told her that she had been granted a Trial Period Plan ("TPP") for a HAMP loan modification. The employee told her that she would get paperwork in the mail with further information. According to her, she was also told that if she made the required monthly TPP payments, she would be given a permanent modification at the end of the trial.

On December 24, 2009, Nickerson-Reti received a letter stating that she had been granted a TPP. Her monthly TPP payment was $1,582.16. On December 30, she received a document requiring her to submit additional information and make certain representations about her finances. The document stated that if she complied with the requirements of her TPP, BANA

would provide her with a HAMP modification. The document also stated that it acted as a revocation of BANA's waiver of payment for escrow items. (TPP, Docket No. 32, Ex. 3, ¶ 4(C)). Finally, it stated that BANA would send her a permanent loan-modification agreement if she complied with the terms of the TPP.

On January 13, 2010, Nickerson-Reti signed and returned the TPP document to BANA along with all of the requested forms, documents, and information. She faxed them to BANA again when she called and learned that it had not received the materials.

From February 2010 until August 2010, BANA sent Nickerson-Reti monthly statements informing her that she was participating in the TPP and that her monthly payment amount was $1,582.16. From December 2009 through August 2013, BANA also charged Nickerson-Reti for various escrow items. She had previously paid these costs directly instead of paying them to BANA.

On September 3, 2010, Nickerson-Reti received a letter from BANA stating that she had been denied a permanent HAMP modification because she had failed to submit proper documentation. According to the amended complaint, when she called BANA that day, an employee told her she had provided the documents and that the decision to deny her a modification would be appealed.

On September 24, 2010, Nickerson-Reti called BANA and spoke to an employee who told her that her appeal had been denied. In the following months, she attempted to get an explanation from BANA as to why she was unable to receive a permanent HAMP modification. She also requested copies of her loan file. BANA did not tell her why she was denied a modification and refused to give her copies of her loan file.

On December 31, 2010, Nickerson-Reti received a notice from BANA stating that it would foreclose on her mortgage unless she cured a default of $23,823.13 by January 30, 2011. Throughout 2011, she continued to send BANA mortgage payments of $1,582.16 as specified by the TPP. BANA in turn sent her checks in various amounts, stating that they were returns of partial payments.

### 4. Second Loan-Modification Request

In early 2012, on advice from her attorney, Nickerson-Reti again applied for a HAMP modification to delay foreclosure. She contends that BANA employees treated her poorly, consistently lost her loan documentation, and told her to ignore document requests. She eventually received notice that a foreclosure sale for her home would be held on June 12, 2012.

On June 1, 2012, Nickerson-Reti received a non-HAMP loan-modification application. The application stated that BANA had been unable to contact her. She contends that in the two weeks before she received the application, she had made numerous calls to BANA that had not been returned.

On June 21, 2012, BANA agreed to stay the foreclosure sale.

On September 21, 2012, BANA employee Kareem Neesman called Nickerson-Reti to ask her for documents that she had not provided.[3] He said she had not provided documents showing "proof of child support and proof of hardship for disability." (Proposed Am. Compl. ¶ 85). Neesman and his supervisor told Nickerson-Reti they were considering her eligibility for loan-modification programs for individuals with disabilities and asked her several questions about her

---

[3] The proposed amended complaint refers to Kareem Neesman as "Neeseman," "Neesman," and "Neesom" at different points. (*See* Proposed Am. Compl. ¶¶ 85, 88, 168). The Court will refer to him as "Neesman" because the proposed amended complaint uses that spelling a majority of the time.

disability.[4]  Nickerson-Reti told them she wanted to apply for programs for the unemployed or rental homes instead of those for individuals with a disability.

On October 1, 2012, Nickerson-Reti made a complaint about Neesman to his supervisor, who assigned her account to another BANA employee.  On February 4, 2013, her application for a loan modification was denied because her documents were out of date.  According to her, BANA never informed her the documents she had sent in were out of date.  Neesman was also reassigned to Nickerson-Reti's loan account sometime between October 1, 2012, and May 28, 2013.  BANA did not take Neesman off the account, even after Nickerson-Reti complained.

### 5.     Sale of the Home

In 2013, Nickerson-Reti's son was accepted to a college in California.  As a result, she wanted to move to California to help support him and rent out her home in Lexington.  BANA told her it would foreclose on her home if she rented it out.  To avoid foreclosure, Nickerson-Reti sold her home for $700,000 on August 28, 2013.[5]

On June 1, 2009, Nickerson-Reti's credit score was 804.  As a result of her mortgage-loan difficulties, her credit score on August 28, 2013, was 535.  During one month, Nickerson-Reti was without heat and hot water.  She was also unable to secure an apartment for herself when she moved to California.  She instead "was forced to live with her two cats for five months out of her car with nights at various Motel 6s until she was able to find a run-down apartment where the landlord didn't ask too many questions."  (Proposed Am. Compl. ¶ 96).

---

[4] Nickerson-Reti is apparently disabled, although the nature of the disability is unclear from the pleadings.

[5] The proceeds of the foreclosure sale are being held by the Court pending the outcome of this case.

**B.** **Procedural Background**

Nickerson-Reti filed the complaint in this case in Suffolk Superior Court on August 16, 2013. The case was removed to this Court on November 20, 2013. On December 30, 2013, Nickerson-Reti amended the complaint. The amended complaint alleges claims of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2. On February 4, 2014, counsel for Nickerson-Reti withdrew from the case. Nickerson-Reti was unable to find successor counsel and is proceeding *pro se*.

On February 12, 2014, defendant moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6), contending that it was under no legal duty to grant Nickerson-Reti a mortgage-loan modification. On April 23, 2014, Nickerson-Reti moved to amend the amended complaint. Her proposed amended complaint alleges breach of fiduciary duty (Count I); two counts of breach of contract (Counts 2 and 3); breach of the implied covenant of good faith and fair dealing (Count 4); promissory estoppel (Count 5); violations of Chapter 93A (Count 6); violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* (Count 7); and violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Fair Housing Act, 42 U.S.C. § 3604 *et seq.* (Count 8).

**II.** **Standard of Review**

**A.** **Motion to Amend**

Under Fed. R. Civ. P. 15, a party may amend its pleading once as a matter of course within 21 days after serving it, or within 21 days after service of a responsive pleading or motion under Fed. R. Civ. P. 12(b), (e), or (f). *See* Fed. R. Civ. P. 15(a)(1). In all other cases, a party

may amend a pleading only with consent of the opposing party or leave of the court.  *See* Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  *Id.*  "The leave sought should be granted unless the amendment would be futile or reward undue delay." *Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 117 (1st Cir. 2009).  "A request for leave to amend filed before discovery is complete and before a motion for summary judgment has been filed is 'gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6).'"  *Juarez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 276 (1st Cir. 2013) (quoting *Hatch v. Dep't for Children*, 274 F.3d 12, 19 (1st Cir. 2001)).

### B.    Motion to Dismiss

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief."  *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## III.   **Analysis**

Plaintiff has moved to amend her complaint to state ten claims:  (1) breach of fiduciary duty; (2) breach of the mortgage contract; (3) breach of the TPP contract; (4) breach of the implied covenant of good faith and fair dealing; (5) promissory estoppel; (6) violations of Chapter 93A; (7) violations of the ECOA; (8) violations of the ADA, RHA, and FHA; (9) fraud; and (10) unjust enrichment.  Defendant contends that plaintiff should not be allowed to amend her complaint, because she did not identify what inaccuracies were in her first amended complaint and because she did not explain why those inaccuracies could not have been discovered until now.  The grounds for denial of a motion to amend include "undue delay, bad faith or dilatory motive[,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party[,] and futility of amendment."  *ACA Financial Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 56 (1st Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (internal alterations omitted).

Plaintiff is proceeding *pro se* in this case.  Although the complaint has been amended once, plaintiff has represented that her former counsel amended the complaint without allowing her to review the amendments.  She also contends that after failing to retain successor counsel, she reviewed the amended complaint herself and is attempting to correct its errors and omissions in good faith.  Defendant has not contended that it will suffer undue prejudice from an amendment of the complaint.  Under the circumstances, futility is the proper ground for denying leave to amend.  The Court will therefore turn to the merits of plaintiff's proposed amended complaint.[6]

---

[6] Defendant has also moved to dismiss the first amended complaint.  Because the Court finds that some of plaintiff's amended claims would not be futile, the motion to dismiss will be denied as moot.

A.    **Breach of Fiduciary Duty (Count 1)**

The proposed complaint first alleges a claim for breach of fiduciary duty.  To state a claim of breach of fiduciary duty under Massachusetts law, a plaintiff must allege "(1) the existence of a fiduciary duty arising from a relationship between the parties, (2) a breach of that duty, (3) damages, and (4) causation." *Pearson v. United States*, 831 F. Supp. 2d 514 (D. Mass. 2011) (quoting *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164, n.18 (1999)).  "[T]he relationship between a lender and a borrower, without more, does not establish a fiduciary relationship." *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 102 (1st Cir. 2009) (citing *Superior Glass Co. v. First Bristol County Nat'l Bank*, 380 Mass. 829, 832 (1980)).  However, a fiduciary relationship may arise in a lender-borrower relationship "where the borrower reposes its trust and confidence in the lender and the lender knows of and accepts the borrower's trust." *Id.* (citing *Superior Glass*, 380 Mass. at 832 and *Broomfield v. Kosow*, 349 Mass. 749, 755 (1965)).

The proposed amended complaint alleges that plaintiff defaulted on two of her mortgage payments because defendant told her it would increase her chances of receiving a mortgage-loan modification.  However, it does not allege that defendant "was aware of or accepted this trust, a necessary condition for finding a fiduciary relationship." *Id.* at 102.  There is nothing in the proposed amended complaint to suggest that defendant treated its interactions with plaintiff as anything more than an arms-length business transaction.  *Compare Frappier v. Countrywide Home Loans, Inc.*, 645 F. 3d 51, 59 (1st Cir. 2011) (no fiduciary relationship where mortgagee's employee worked with mortgagor for months, gave mortgagor his personal telephone number, and told mortgagor he would "take care" of the mortgage) *with Bakis v. National Bank of*

*Greece, S.A.*, 1998 WL 34064622, at *2-3 (Mass. Super. Ct. Dec. 15, 1998) (fiduciary

relationship existed where bank targeted the Greek community of the Boston area by exploiting

personal relationships and invoking notions of Greek pride, and failed to disclose to investors

they were solicited to relieve the bank of its liability on unsecured and risky loans).[7]

A fiduciary relationship between a lender and a borrower can also arise if the lender

actively exercises control over the borrower. *FAMM*, 571 F.3d at 103 (collecting cases).

"Massachusetts courts have not defined what level of control is sufficient to give rise to a

fiduciary duty under this theory, but have held that involvement in the debtor's affairs that is not

unusual in the context of a commercial loan is clearly insufficient." *Id.* (citing *Shawmut Bank,*

*N.A. v. Wayman*, 34 Mass. App. Ct. 20, 24(1993)). Although the proposed amended complaint

makes conclusory allegations that defendant "assumed discretionary authority over plaintiff's

interests" and "had nearly unilateral control over all aspects of the process," (Proposed Am.

Compl. ¶ 110), it does not allege any facts that show defendant exercised control over plaintiff's

decision to skip two of her mortgage payments. *See Iqbal*, 556 U.S. at 678 (when deciding a

motion to dismiss under Rule 12(b)(6), courts need not accept as true "mere conclusory

statements" in the complaint).

The proposed amended complaint therefore fails to state facts sufficient to allege that

defendant owed plaintiff a fiduciary duty. Accordingly, the motion to amend will be denied as to

the claim for breach of fiduciary duty.

**B.** **Breach of the Mortgage Contract (Count 2)**

---

[7] Plaintiff contends that defendant's marketing materials show that it accepted her trust because they offered help through loan counselors and loan-modification programs. (*See* Docket No. 40, Ex. 10). However, these statements are "generalized marketing and 'puffing' [that] cannot give rise to a fiduciary relationship." *Kriegel v. Bank of America, N.A.*, 2010 WL 3169579, at *13 (D. Mass. Aug. 10, 2010) (collecting cases).

The proposed amended complaint next alleges that defendant charged plaintiff for escrow items in breach of the mortgage contract. "To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at minimum, that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Gluckenberger v. Boston University*, 957 F. Supp. 306, 316 (D. Mass. 1997). Neither party disputes that the mortgage in this case was a valid contract between plaintiff and defendant.

The mortgage contract requires plaintiff to pay defendant for "escrow items." (Mortgage Contract ¶¶ 1, 3). These "escrow items" include taxes and assessments for liens, leasehold payments or ground rents, and property and mortgage insurance premiums. (*Id.* ¶ 3). The contract allows defendant to waive payments for escrow items in writing, so long as plaintiff handles the escrow items herself. (*Id.*). However, the TPP agreement plaintiff received in December 2009 stated that it "constitutes notice that the [s]ervicer's waiver as to payment of [e]scrow [i]tems, if any, has been revoked." (TPP ¶ 4(C)).[8]

The proposed amended complaint alleges defendant charged plaintiff for escrow items from December 2009 until August 2013. Even if defendant had waived the escrow-item payments when it first entered into the mortgage contract, it withdrew that waiver when agreeing to the TPP with plaintiff. Charging her for those escrow items was therefore not in violation of the original mortgage contract.

Accordingly, the motion to amend will be denied as to the claim for breach of the mortgage contract.

---

[8] Defendant contends that the TPP was not a valid contract. The Court addresses this contention below.

C.      **Breach of the Trial Period Plan Agreement (Count 3)**

The proposed amended complaint also alleges that defendant breached the TPP agreement by refusing to grant plaintiff a loan modification.  Defendant contends that the TPP agreement was not a valid contract because it lacked consideration.

The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.  *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 31-32 (1st Cir. 1989); Restatement (Second) of Contracts § 17.  "In order for a contract to have a valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor."  *Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) (internal quotation and alteration omitted).  Invoking the pre-existing duty rule, defendant contends that because plaintiff's partial monthly mortgage payments under the TPP went towards satisfying her undisputed pre-existing mortgage loan obligations, the TPP payments cannot constitute new bargained-for consideration.  *See In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980).

Defendant is correct that modified mortgage payments, standing alone, would likely not constitute cognizable consideration.  Plaintiff's legal detriment, however, consisted of more than the modified monthly payments.  Under the TPP, plaintiff was required to provide documentation of her current income, make legal representations about her personal circumstances, and obtain credit counseling as defendant required.  (TPP ¶ 1).  As explained above, the TPP agreement also required plaintiff to make payments for escrow items to defendant.  (*Id.* ¶ 4(C)).  These conditions of the TPP agreement all constituted new legal detriments to plaintiff that flowed from her acceptance.  *See Kiluk v. Select Portfolio Serv., Inc.*,

2011 WL 8844639, at *7 (D. Mass. Dec. 19, 2011) (collecting cases).  The complaint thus

sufficiently alleges facts showing that the TPP agreement was supported by consideration.

Defendant also contends that it did not breach the TPP agreement by not giving plaintiff

a loan modification because it does not entitle her to a modification.  As defendant points out,

the TPP agreement states that "the servicer will not be obligated or bound to make any

modification of the Loan Documents . . ."  (Pl. Mem. at 5 (quoting TPP ¶ 2(G)) (emphasis

omitted)).

However, the entirety of the quoted sentence from paragraph 2(G) of the TPP agreement

reads, "I further understand and agree that the Servicer will not be obligated or bound to make

any modification of the Loan Documents *if I fail to meet any one of the requirements under this*

*Plan*."  (TPP ¶ 2(G) (emphasis added)).  The TPP agreement also states, "If I am in compliance

with this Trial Period Plan . . . then the Servicer will provide me with a Home Affordable

Modification Agreement . . ."  (TPP at 1).

Defendant makes the same argument rejected by the First Circuit in *Young v. Wells*

*Fargo Bank, N.A.*, 717 F.3d 224 (1st Cir. 2013).  In *Young*, the court interpreted a TPP

agreement almost identical to the one in this case.  717 F.3d at 235.  The defendants in *Young*

contended that they "had no obligation to tender a permanent loan modification . . . relying

specifically on Section 2(G)."  *Id.*  The *Young* court rejected the defendants' arguments,

determining that "[t]he TPP's plain terms . . . required [defendants] to offer [plaintiff] a

permanent modification."  *Id.* at 234.  The court also stated that "[a]lthough [defendant's]

reading is not implausible as a matter of language, defendants invoke it to advance the

unreasonable proposition that they can unilaterally render large swaths of the TPP nugatory."  *Id.*

16

at 235. The court therefore vacated the dismissal of the plaintiff's breach-of-contract claim based on breach of her TPP. *Id.* at 235-36.[9]

The proposed amended complaint in this case alleges essentially the same facts as the complaint in *Young*. In particular, it alleges that plaintiff complied with all the provisions of the TPP agreement, was denied a loan modification, and was not given a decision on her loan modification until many months after the trial period had ended. It therefore alleges facts sufficient to state a claim for breach of contract. *See Young*, 717 F.3d at 235-46; *Kiluk*, 2011 WL 8844639, at *7 (collecting cases and concluding that "the growing chorus of cases in this district hold that the TPP is sufficient to meet the pleading standards of Rule 12(b)(6), and that alleging defendant's failure to permanently modify the loan can be sufficient to withstand a motion to dismiss").

Defendant's final argument is that because plaintiff owed it the fees, interest, and escrow she claims as damages, regardless of whether or not she received a loan modification, the proposed amended complaint does not state sufficient facts to allege damages from a breach of contract. However, the proposed amended complaint "does allege damages, both in terms of the accrued fees and charges in the period during which [defendant] allegedly should have tendered a permanent loan modification or at least a decision, and in terms of relief foregone by [plaintiff] during that same period." *Belyea v. Litton Loan Serv., LLP*, 2011 WL 288 4964, at*9 (D. Mass. Jul. 15, 2011). Neither of those categories of damages were owed to defendant by plaintiff

---

[9] Courts in this district have struggled with whether a TPP "obligates servicers to provide borrowers who are in compliance with a permanent loan modification or merely a decision on a permanent loan modification." *Kiluk*, 2011 WL 8844639, at *7 (internal quotation omitted). Under *Young*, TPPs, at minimum, require the latter. 717 F.3d at 235-36. The distinction in this case is moot at this stage of the proceedings because the proposed amended complaint alleges that plaintiff first received notice that her loan modification was denied on September 3, 2010, more than four months after her TPP ended. (TPP ¶ 2; Proposed Am. Compl. ¶ 58).

before the TPP agreement.

Accordingly, the motion to amend will be granted as to the claim alleging breach of the TPP agreement.[10]

**D.**     **Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 4)**

"Every contract implies good faith and fair dealing between the parties to it.  The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to its fruits of the contract." *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 569-70 (2010) (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991)).  In order to prevail on this claim, plaintiffs must show that defendant "acted with . . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing."  *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996).  Courts must consider whether "the challenged conduct conformed to the parties' reasonable understanding of performance obligation, as reflected in the overall spirit of the bargain," when analyzing such claims.  *Speakman v. Allmerica Financial Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

Defendant correctly notes that the implied covenant does not create rights or duties not otherwise provided for in the existing contractual relationship.  *See Uno Restaurants, Inc. v.*

---

[10] Plaintiff also contends that defendant is estopped from contending that the TPP agreement is not a contract by *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, 2011 WL 2637222 (D. Mass. Jul. 6, 2011).  There, several individual mortgagors brought putative class actions against BANA for, among other things, breach of contract based on their TPPs.  The court in that case denied BANA's motion to dismiss the TPP-related breach-of-contract claims.  For estoppel to apply, the previous court decision must be "a final judgment on the merits."  *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010).  "Denial of a motion to dismiss under Rule 12(b)(6) 'ordinarily is not a final judgment that will support issue preclusion on the sufficiency of an identical complaint filed in a different action.'" *Lowenstern v. Residential Credit Solutions*, 2013 WL 697108, at *4 (quoting Charles A. Wright & Arthur R. Miller, 18A Fed. Prac. & Proc. Juris. § 4439 (2d ed.)).  BANA is therefore not precluded from contending the TPP agreement in this case is not a contract.

*Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The proposed amended complaint, however, details a series of defendant's actions and omissions that undermined plaintiff's ability to perform under the TPP agreement and meet defendant's performance expectations. In particular, it alleges that defendant refused plaintiff a loan modification on the grounds that she did not supply all the necessary documents when she repeatedly supplied those documents. It also alleges that defendant did not act on plaintiff's application until after she repeatedly contacted it. This is sufficient to state a claim under the breach of the implied covenant of good faith and fair dealing. *See Young*, 717 F.3d at 239 (noting that "there may be circumstances in which an unreasonable delay in performance or sustained inattention would give rise to an implied covenant claim under Massachusetts law").

Accordingly, the motion to amend will be granted as to the claim for breach of the implied covenant of good faith and fair dealing.

### E.  Promissory Estoppel (Count 5)

As it is in this case, promissory estoppel is usually asserted as an alternative theory of recovery for a contract that is not supported by consideration. Because the proposed amended complaint states a plausible claim for breach of contract supported by consideration, the Court need not consider the alternative promissory estoppel theory at this juncture. *See Belyea*, 2011 WL 2884964, at *9; *Durmic v. J.P. Morgan Chase Bank, NA*, 2010 WL 4825632, at *5 (D. Mass. Nov. 24, 2010). Accordingly, plaintiff's motion to amend will be granted as to the promissory estoppel claim.

### F.  Violations of Chapter 93A (Count 6)

The proposed amended complaint also alleges that defendant engaged in unfair and

deceptive actions in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2. "Conduct is unfair or deceptive if it is 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous." *Cummings v. HPG Int'l Inc.*, 244 F.3d 16, 25 (1st Cir.2001) (quoting *PMP Assoc. Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596, 321 N.E.2d 915 (1975)).

Defendant contends that a violation of HAMP or failure to grant a HAMP loan modification is not a *per se* violation of Chapter 93A. However, the proposed amended complaint alleges more than just violations of HAMP. In particular, it alleges that defendant's representatives falsely told her that they had not received proper documents, failed to consider her loan modification in a timely manner, did not take action on her application until she had repeatedly contacted defendant, and denied her a loan modification because she failed to submit proper documentation when she in fact had provided that documentation. Courts have consistently held that allegations of misleading representations in connection with HAMP loan modifications can state a claim for violations of Chapter 93A. *See Young*, 717 F.3d at 241-42 (vacating dismissal of Chapter 93A claim where the plaintiff's claim "extend[ed] beyond the alleged breaches of the TPP and include[d] defendants' handling of her entire case, beginning with the negotiations surrounding her forbearance agreement through her attempts to obtain a permanent loan modification"); *Stagikas v. Saxon Mortg. Serv., Inc.*, 2013 WL 5373275, at *4 (D. Mass. Sep. 24, 2013) (collecting cases for the proposition that "[c]ourts have found that when defendants misrepresented to plaintiffs the status of their HAMP application, their rights under HAMP, or their eligibility for a permanent loan modification these acts were sufficiently

unfair or deceptive to impose [Chapter] 93A liability" (internal quotations omitted)).

Accordingly, the motion to amend will be granted as to the claim alleging a violation of Chapter 93A.

### G.    Violations of the Equal Credit Opportunity Act (Count 7)

"Originally enacted in 1974 to prohibit discrimination in credit transactions, the ECOA was amended in 1976 to require creditors to furnish written notice of the specific reasons for adverse action taken against a consumer." *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, 2011 WL 2637222, *6 (D. Mass. Jul. 6, 2011) (quoting *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 146 (5th Cir. 1983)).  The ECOA provides that "[w]ithin thirty days . . . after the receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application."  15 U.S.C. § 1691(d)(1).[11]  It also provides that "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor."  *Id.* § 1691(d)(2).  An "adverse action" is defined as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested."  *Id.* § 1691(d)(6).

The proposed amended complaint alleges that defendant failed to give plaintiff proper notice of any actions it took concerning her HAMP loan modification.  However, the denial of a mortgage-loan modification does not constitute an "adverse action" under ECOA because it does not include a denial or revocation of credit.  *See In re HAMP Contract Litig.*, 2011 WL 2637222, at *7 (dismissing ECOA claim where plaintiffs alleged that defendant denied them a HAMP loan

---

[11] Although the statute has been amended twice since 2009, the amendments did not change the sections of the statute applicable to this case.

modification even when they complied with the terms of a TPP). Even assuming plaintiff was wrongfully denied a permanent loan modification, defendant had no obligation to give plaintiff a statement of reasons for that denial under the ECOA.

Accordingly, the motion to amend will be denied as to the ECOA claim.

**H.      ADA, RHA, and FHA Claims (Count 8)**

Next, the proposed amended complaint alleges violations of the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Act.

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). It is discriminatory to deny to an individual the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity on the basis of a disability. *Id.* § 12182(b)(1)(A)(i). To state a claim under the ADA for discriminatory denial of services, plaintiff must allege that (1) she is a person with a disability, (2) defendant is a place of public accommodation, (3) defendant has a discriminatory policy or practice in effect, and (4) she requested a reasonable modification in that policy or practice that would have afforded her access to the desired service. *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003).

Section 504 of the RHA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). To state a claim under that section, plaintiff must allege that (1) she is disabled, (2) she sought services from a federally

funded entity, (3) that she was otherwise qualified to receive those services, and (4) she was denied those services solely by reason of her disability. *Lesley v. Hee Man Chie*, 250 F.3d 47, 52-53 (1st Cir. 2001).

The FHA provides that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction . . . because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). Under the statute, a home-mortgage loan is a "residential real estate-related transaction." *Id.* § 3605(b)(1)(B).

The proposed amended complaint alleges defendant violated the ADA, RHA, and FHA by (1) asking plaintiff about her disability when gathering information for her second loan-modification request; (2) steering her towards non-HAMP loan modifications designed for people with disabilities; (3) pursuing foreclosure proceedings at the same time it evaluated her for disability loan products; and (4) reassigning Kareem Neesman to her loan account and brushing off her concerns when she complained.[12]

None of those allegations state facts that show that defendant denied plaintiff a loan modification because of her disability. Instead, the proposed amended complaint alleges that after plaintiff was denied a HAMP loan modification, two of defendant's employees inquired about her disability to see if she qualified for any of its loan-modification programs designed for individuals with disabilities. It further alleges that she refused to consider those programs and instead continued to pursue alternative loan-modification programs, and that she became upset when one of the employees who asked about her disability was reassigned to her account after

[12] The proposed amended complaint does not identify the disability, or how the bank came to learn of it.

she had asked for him to be removed.

To state a claim for discrimination due to disability under the ADA, RHA, or FHA, plaintiff must allege that she was denied accommodation or services because of her disability. *See* 42 U.S.C. § 12182(b)(1)(A)(i); 29 U.S.C. § 794(a); 42 U.S.C. 3605(a). According to the proposed amended complaint, defendant did not refuse plaintiff services because of her disability. Instead, it offered to accommodate her disability and she rejected those offers. The proposed amended complaint therefore does not state sufficient facts to allege a claim for violations of the ADA, RHA, or FHA. Accordingly, the motion to amend will be denied as to that claim.

## I.      Fraud (Count 9)

The proposed amended complaint also alleges a claim of fraud. In Massachusetts, a defendant may be liable for fraudulent misrepresentation if it "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act theron, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." *Danca v. Taunton Sav. Bank*, 395 Mass. 1, 8 (1982).

According to the proposed amended complaint,

[f]raudulent representations include, but are not limited to statements that foreclosure was no big deal and could be fixed by Patrick, telling her that her default was cured by a payment of $900[].49, dual-tracking activities, sending her defective [r]ight to [c]ure notices, concealing the nature and scope of [d]efendant's fraudulent activities, denying her access to information, representing themselves as holder of her mortgage with standing to foreclose, representing that they could sell her home at a foreclosure auction if she rented it out.

(Proposed Am. Compl. ¶ 172).[13]

_____

[13] The proposed amended complaint alleges that the necessary payment was for $9000.49, which the Court assumes is a typographical error.

As a threshold matter, Rule 9(b) requires that a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "It is well-established that 'this rule entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations.'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 190-91 (1st Cir. 2006) (quoting *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991)). Many of the allegations of fraud in the proposed amended complaint fail to satisfy those requirements. For example, the allegation of "dual-tracking" is the practice of "simultaneously considering mortgage mitigation while scheduling foreclosure." *Worrall v. Federal Nat. Mortg. Ass'n*, 2013 WL 6095119, at *5 (D.N.H. Nov. 30, 2013). While the complaint alleges that defendant dual-tracked plaintiff's mortgage loan, it does not allege a specific false or fraudulent representation associated with the alleged dual-tracking.

Only two allegations of fraud in the complaint satisfy those requirements. The first is an alleged October 27, 2009 statement by BANA employee Ann Stolle that a $900.49 payment would resolve her default. (Proposed Am. Compl. ¶¶ 29-32). The second is an alleged November 9, 2009 statement by BANA employee Brendon that "it's no big deal if it goes into foreclosure; Patrick can change that." (Proposed Am. Compl. ¶ 35).

To state a claim for fraud, a plaintiff must allege that (1) the defendant made a false representation of a material fact, (2) the defendant knew that the alleged representation was false, (3) the defendant purposefully induced the plaintiff to rely on that representation, (4) the plaintiff relied on that representation as being true, and (5) the plaintiff was damaged by acting on that representation. *See Stolzoff v. Waste Sys. Int'l Inc.*, 58 Mass. App. Ct. 747, 759 (2003).

As to the first alleged misrepresentation, the proposed amended complaint alleges that a

BANA employee told plaintiff that paying $900.49 would cure the default on her mortgage, that plaintiff relied on that statement and paid the full amount, but that she continued to be in default on her mortgage. As to the second alleged misrepresentation, the proposed amended complaint alleges that a BANA employee told plaintiff that it was "no big deal" if her house was foreclosed on, and that she relied on that statement to her detriment. That is enough to survive a motion to dismiss; whether the claims would survive at another stage of the proceedings is a question for another day.

Accordingly, the motion to amend will be granted as to the fraud claim.

### J.      Unjust Enrichment (Count 11)

Finally, the proposed amended complaint alleges a claim for unjust enrichment. Massachusetts defines unjust enrichment as the "retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Santagate v. Tower*, 64 Mass. App. Ct. 324, 329 (2005). To succeed on a claim for unjust enrichment, a plaintiff must show (1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation or knowledge by the defendant of the benefit, and (3) that acceptance or retention of the benefit under the circumstances would be inequitable without payment for its value. *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009).

However, unjust enrichment is "an equitable remedy, and 'it is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy in law.'" *Foley v. Yacht Mgmt. Grp.*, 2011 WL 4020835, at *8 (D. Mass. Sep. 9, 2011) (citing *Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 324 (D. Mass. 2005)). Here, the

damages plaintiff claims on a theory of unjust enrichment are precisely the same damages that she claims on her other legal theories. The other claims would suffice to provide an adequate remedy at law if plaintiff indeed suffered any cognizable injury.

Accordingly, plaintiff's motion to amend will be denied as to the unjust enrichment claim.

## VI.    Conclusion

For the foregoing reasons, plaintiff's motion for leave to file is GRANTED as to the claims for breach of the TPP agreement (Count 3), breach of the implied covenant of good faith and fair dealing (Count 4), promissory estoppel (Count 5), violations of Chapter 93A (Count 6), and fraud (Count 9), and DENIED in all other respects. Defendant's motion to dismiss is DENIED as moot.

**So Ordered.**


                                                   /s/ F. Dennis Saylor
                                                   F. Dennis Saylor IV
Dated: June 26, 2014                               United States District Judge