# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **DONNAH NICKERSON-RETI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **13-12316-FDS** |
| **v.** | ) | |
| | ) | |
| **BANK OF AMERICA, N.A., successor by** | ) | |
| **merger to BAC Home Loans Servicing, LP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

**SAYLOR, J.**

This is a dispute over an alleged right to a mortgage modification. Plaintiff Donnah Nickerson-Reti alleges that she received a modification to her mortgage loan under the Home Affordable Mortgage Program ("HAMP") and made timely payments on it, but that defendant Bank of America did not honor the modification. The bank has moved for summary judgment in its favor. It contends that her claim is without merit for a variety of reasons, among them that she merely applied to be considered for a modification; that her application was properly denied because she did not submit the required documents; and that no contract between the parties was ever formed.

This is yet another installment in the protracted nationwide litigation over the HAMP program. That litigation has been notable, among other things, for the widespread disagreement and confusion among borrowers, lenders, and the courts concerning the meaning of one of the critical program documents: the Trial Period Program, or "TPP," agreement. In substance, the Court concludes that the TPP process is intended to involve three steps leading up to the

formation of a contract to modify a mortgage: (1) an invitation by a lender to a borrower to make an offer, (2) an offer by the borrower, and (3) acceptance by the lender. The attempted arrangement here failed at the third stage, because the bank never accepted the TPP agreement. Nonetheless, based on evidence of potential mistakes or misconduct by the bank, plaintiff's claim under Mass. Gen. Laws ch. 93A will survive.

Accordingly, and for the reasons set forth below, that motion for summary judgment will be granted in part and denied in part.

## I.    Background

Except where otherwise noted, the following facts are set forth in the light most favorable to plaintiff.

### A.    Factual Background

Donnah Nickerson-Reti purchased a property at 133 Burlington St. in Lexington, Massachusetts, on June 22, 2007, with the help of a $417,000 mortgage loan. (Def. SMF Ex. B at 23:5-11, 26:21-23, 48:1-3). She executed a promissory note promising to repay the debt with 5.625% interest over 30 years and gave a mortgage as security for the note. (*Id.* Ex. B at 28:22-23, 48:1-49:14). Her monthly payment was $2,400.49. (*Id.* Ex. B at 48:1-19, 49:6-14).

Nickerson-Reti made timely payments for almost two years, and even made additional payments in order to bring down the principal. (*Id.* Ex. B at 53:19-54:1; Pl. SMF Ex. P). As of the beginning of 2009, she was current on her payments. She contends that she could have afforded to continue making them in the near future, but that her financial situation had deteriorated. (Def. SMF Ex. B at 64:4-11).[1] She testified that in the next year or two she would

---

[1] Nickerson-Reti is a physician licensed by the Commonwealth of Massachusetts to practice medicine. (Def. SMF Ex. B at 15:13-24, 16:18-21).

have been required to apply for public assistance or sell her possessions in order to make her monthly payments. (*Id.* Ex. B at 73:11-75:4; *see also id.* Ex. B at 64:13-17 ("I wanted to take a proactive approach and do something to lower my interest rate and keep things more manageable in case. . . . My credit rating was over 800, and I wanted to keep it that way.")).

Nickerson-Reti did not seek to refinance the loan, or to sell the property and move somewhere less expensive. Instead, she made an inquiry to Bank of America about her eligibility for a modification of her mortgage under the Home Affordable Mortgage Program ("HAMP"), a program intended to assist financially struggling homeowners avoid foreclosure. She made three or four calls for that purpose between February and April 2009. (Def. SMF Ex. B at 53:15-19).

Again, at that point, Nickerson-Reti was current on her payments. A representative from Bank of America told her that in order to be considered for HAMP, she had to miss payments. (Def. SMF Ex. B at 52:23-24). The representative told her that the bank would not consider her for a HAMP modification because she had not missed two months' payments. (*Id.* Ex. B at 66:23-67:11). The bank did, however, offer to refinance her mortgage at a 4% or 4.5% interest rate. (*Id.*). Nickerson-Reti declined that offer, specifically because she wanted her interest rate to be reduced to 2%, as allegedly promised by the HAMP program. (*Id.* Ex. B at 67:24-68:20).

Accordingly, Nickerson-Reti deliberately went into default to try to qualify for the HAMP program. For "two months, [she] purposely did not make the mortgage payment, because the person on the phone at Bank of America told [her] that . . . it's what [she] needed to do to be considered for a HAMP modification." (*Id.* Ex. B at 53:10-13).[2]

---

[2] Nickerson-Reti also testified that she was uncomfortable with that advice, and accordingly "made payments to principal, which were then erroneously credited and a mess ensued for several months that I had to spend a lot of time trying to talk to various people to get things credited properly." (Def. SMF Ex. B at 53:1-6). From the documentation of her payment history, it appears that she made these reduced "payments to principal" in

Nickerson-Reti wrote a letter to the bank on April 13, 2009, explaining the "difficult circumstances related to my request for a Home Affordable Modification to my mortgage." (Pl. SMF Ex. R). On April 29, 2009, the bank invited her to apply for a "workout alternative" and requested a checklist of certain documents. (*Id.*). One item on the checklist requested: "Verification of all sources of income (including last 30 days of pay stubs). If self employed, please provide current profit and loss statements." (*Id.*). Nickerson-Reti returned the checklist at some point with that item checked off, and the handwritten notation next to it reads "Self employed. No profit/loss statements. IRS 1040 sent previously." (*Id.*). Nickerson-Reti apparently faxed to the bank her May 2009 real-estate tax bill and proof of her homeowners insurance policy. (*Id.*). It is not clear when Nickerson-Reti previously sent her Form 1040, or specifically what other proof-of-income documents she had sent at that point.

On December 30, 2009, Bank of America sent Nickerson-Reti a written Loan Modification Trial Period Plan ("TPP") package. The cover letter stated:

> We recently sent you a letter with instructions on how to start making your new trial period mortgage payment of $1,582.16 as part of the three-month trial period under the Federal Government's Home Affordable Modification Program. If you haven't already done so, it is important that you take the first step by making your first month's trial period mortgage payment as soon as possible. **Making this payment allows you to begin the trial period while you gather the requested documentation.**
>
> . . . .
>
> If for some reason you are not eligible for the Home Affordable Modification Program once you've started the trial period, we will contact you and review other options. **Once you've made your first trial period mortgage payment, the next step is for you to return the requested documents and enclosed forms** in order to finalize the three-month trial period and qualify for the permanent modification of your loan.

---

April and May 2009, and then missed her payments entirely in July and August. (Pl. SMF Ex. P at 4-5 (showing "regular payments" of $2,400.49 in March, June, and September 2009, a "misc. posting" payment of $1,400 in April, a "misc. posting" payment of $1,500 in May, and no payments at all in July or August)).

. . . .

**Please complete the enclosed documents and return them with the required financial information by 2/1/2010**.

(Def. SMF Ex. C at 1). Under the TPP, payments in the amount of $1,582.16 (reduced from her existing requirement of $2,400.49) were due on or before February 1, 2010; March 1, 2010; and April 4, 2010. (*Id.* Ex. C at 6).[3]

The TPP package requested, among other things, that Nickerson-Reti provide a "Tax Information Form—IRS Form 4506-T" and certain "Additional Income Documentation." The requested information included, in relevant part, the following:

b. For each borrower **who is self-employed:**

✓ Copy of the most recently filed federal tax return signed and dated for each borrower with all schedules. . . .

✓ Copy of the most recent quarterly or year-to-date profit/loss statement.

. . .

d. For each borrower **who is relying on . . . child support as qualifying income:**

✓ Copy of divorce decree, separation agreement or other written agreement or decree that states the amount of the . . . child support and period of time over which it will be received. Payments must continue for at least three years to be considered qualifying income under this program.

✓ Proof of full, regular and timely payments; for example, deposit slips, bank statements, court verification, or filed federal tax return with all

---

[3] Nickerson-Reti testified that prior to the December 30 TPP offer, she believed she had an oral agreement with the bank. That alleged agreement was based on a conversation with Anne Marie Stolle, a bank representative, who allegedly told her, "If you make the three trial period payments and you give us and [sic] documents, the bank will give you a permanent modification." (Def. SMF Ex. B at 88:16-18, 148:20-23, 165:23-24). Nickerson-Reti contends that she "had more than one offer, and they differed slightly" in that "[u]nder the written offer, the payments were due effective February 1, March 1, April 1, which means that May 1 they were required to give me either a denial or a permanent modification. Under the [alleged] oral contract, my first payment was December 30, that would bring it to December 30, January 30, February 30, and they were required to offer the same rejection or acceptance by . . . March 30." (Def. SMF Ex. B at 89:7-24).

The claim of an oral contract—parallel to, but different from, the claimed written contract—is dubious, to say the least. In any event, and as set forth below, that claim was not addressed in plaintiff's opposition to the motion for summary judgment, and has therefore been waived.

schedules.

(*Id.* Ex. C at 4).

The TPP further provided:

If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

. . . .

I understand that after I sign and return two copies of this Plan to the Servicer, the Servicer will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. *This Plan will not take effect unless and until both I and the Servicer sign it and Servicer provides me with a copy of this plan with the Servicer's signature.*

(*Id.* Ex. C at 5) (emphasis added).[4]  The TPP also stated that "[i]f I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents . . . ."  (*Id.* Ex. C at 7).

Nickerson-Reti signed the TPP on January 13, 2010, and returned it to the bank.  (Def. SMF Ex. B at 79:21-80-21; *id.* Ex. D at 4).  Neither party has provided the Court with Nickerson-Reti's full application.  However, her attorney questioned Chad Anderson, the deposition witness produced by the bank under Fed. R. Civ. P. 30(b)(6), about the contents of

---

[4] The TPP further provides:

If prior to the Modification Effective Date [the first day of the month following the month in which the last Trial Period Payment is due], (i) the Servicer does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Servicer determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.

(Def. SMF Ex. C at 6).

that application.  Anderson acknowledged that Nickerson-Reti provided the bank with a signed

and dated hardship affidavit; a signed and dated 4506-T form; two signed and dated copies of the

TPP; at least two bank statements from her account at Eastern Bank; five checks made out to her

by her husband, Kelman Reti, for child support; and a signed 2008 tax return, including Schedule

C, titled "Profit or Loss from Business."  (Def. SMF Ex. E at 89:14-97:14).  Having reviewed

that application, Anderson testified that the only document that was missing was a copy of the

written agreement stating the amount of child support and the period of time over which it would

be received.  (*Id.* Ex. E at 97:15-98:2).

Nickerson-Reti timely made the three trial-period payments in February, March, and

April, 2010.[5]  She continued to make monthly payments in the amount of $1,582.16 for more

than three and a half years, until she sold the house.  (Def. SMF Ex. B at 83:24-84:10; Pl. SMF

Ex. P).

Nickerson-Reti testified that for eight months, Bank of America sent her statements

telling her that she was in the trial modification period.  (Def. SMF Ex. B at 83:2-84:2; *see id.*

Ex. B 86:16-17 ("I received a signed statement every month saying they had accepted it.")).

On July 30, 2010, the bank sent Nickerson-Reti a letter stating that it was

> unable to finalize [her] Home Affordable Modification until [it] receive[d] the
> following additional and/or correct and complete information from each
> borrower:
>
> - The Request for Modification and Affidavit (RMA) completed and
>   signed by each borrower
>
> - Signed copy of the most recently filed federal tax return with all
>   schedules
>
> - Copy of the two most recent pay stubs not more than 90 days old
>   indicating year-to-date earnings (clean and readable)

---

[5] She also made a payment in the same amount that January.  (Pl. SMF Ex. P at 6).

- If self-employed, copy of the most recent filed federal tax return with all schedules, and copy of the most recent quarterly or year-to-date profit/loss statement

- Copy of two most recent bank statements for two consecutive months

- A signed and dated copy of the IRS form 4506-T or form 4506-T-EZ

(Def. SMF Ex. F at 1).

When asked about this document, Nickerson-Reti testified that she had received many letters like that, but had been told to ignore them. (Def. SMF Ex. B at 122:5-22). According to Nickerson-Reti, she provided the bank with the documents it requested on multiple occasions. She testified that she sent her personal budget worksheet, a hardship letter, and her tax return to the bank for the first time in April 2009. (*Id.* Ex. B at 71:10-72-17). She stated that her income came from Social Security, child support payments from her husband, and some medical consulting. (*Id.* Ex. B at 16:18-21, 20:1-14, 21:18-19). Although she was self-employed as a consulting physician, she stated that she did not have any quarterly or year-to-date profit/loss statements, and that she "provided Schedule Cs from tax returns. That's the only thing I have ever used as such a statement, and I explained that to somebody on the phone and they said okay." (*Id.* Ex. B at 117:2-7).

The July 30, 2010 letter did not refer to missing documentation relating to child-support income. (*See* Def. SMF Ex. F). As to that issue, Nickerson-Reti testified that she was in fact still married to her husband (although they have been separated for twenty years) and that there was no court order or divorce decree concerning the child support; rather, her husband made payments voluntarily, if erratically. (*Id.* Ex. B at 14:2-9, 20:1-21:17).

Nickerson-Reti testified that after she received the July 30 letter, she sent more documents to the bank. (*Id.* Ex. B at 122:5-123:7). She testified that the bank repeatedly lost her

application, forcing her to resubmit documents. (*Id.* Ex. B at 114:11-13, 184:24-185:9, 189:3-9).

As noted, the TPP provided that it would not take effect unless the bank sent a signed copy of the TPP to Nickerson-Reti. She acknowledges that she never received a copy signed by the bank. She nonetheless alleges that a representative of the bank did in fact sign it. (Def. SMF Ex. B at 82:10-83:24). The basis for that claim is unclear, and in any event there is no evidence in the record that the TPP was ever signed by a representative of the bank.

On September 2, 2010, the bank denied her HAMP application. The letter from the bank stated:

> **Request Incomplete**. Your loan is not eligible for a Home Affordable Modification because you did not provide us with the documents we requested. A notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago. We may have also sent you additional notices about missing or incomplete required documents.

(Def. SMF Ex. G at 1).[6]

Later, at a deposition taken in this lawsuit, Geoff Winkler testified as an expert witness for the bank. According to Winkler, the specific papers she failed to provide were "[t]wo recent bank statements, two recent pay stubs, hardship letter, breakdown of monthly expenses, profit-and-loss income statements, [and a] tax return." (Pl. SMF Ex. X at 40:2-9). He did not refer to documents concerning child-support payments.

At some point, a foreclosure of Nickerson-Reti's home was scheduled, although it was never completed. (Def. SMF Ex. B at 160:19-162:1). Nickerson-Reti appears to have applied for or been considered for another debt-workout program in 2012, as there are additional

---

[6] Nickerson-Reti appears to have received two more HAMP rejection letters, one on July 2, 2012, and another on September 11, 2012. (Def. SMF Ex. B at 152:14-155:21). Copies of those rejection letters, however, were not provided to the Court, and the reason for the rejections is unclear. Nickerson-Reti testified that "they were running two separate—or three, I'm not clear—three separate HAMP modification applications for me, and then apparently canceling them all because they couldn't figure out which one was operative." (*Id.* Ex. B. at 185:5-9).

servicing notes from May and June 2012 referring to documents required for a foreclosure "postponement." (Pl. SMF Ex. H). During that process, on May 15, 2012, a Bank of America representative named Ashton Scott contacted Nickerson-Reti about the foreclosure, the postponement, and a related loan-modification request. (Pl. SMF Ex. T at 1:20-46 (recorded telephone conversation referring to her "home loan assistance request," her "sale date" of June 12, 2012, and indicating his intention to post a postponement five days prior to that date)). He explained that the bank had received certain documents related to proving her income and that those documents would be reviewed and then sent to the underwriter, who would determine whether to approve her for a trial modification. (*Id.* Ex. T at 3:10-58). Nickerson-Reti indicated her belief that that process would take nine months, because it had taken that long "the first time." (*Id.* Ex. T at 3:56-4:07). Scott stated that he had reviewed her file and understood that she had been in a trial modification but had been rejected for not submitting the required documents. (*Id.* Ex. T at 5:22-31). She insisted that they had been returned and that a bank representative had confirmed that fact; Scott then revised his statement, contending that they had been returned but were not signed and dated. (*Id.* Ex. T at 5:31-54). Later, he qualified that statement further to say that "some documents were not signed and dated, not all of them." (*Id.* Ex. T at 6:50-57).

Throughout the entire period, Nickerson-Reti maintained that she had a valid modification of her mortgage loan. She continued to make regular payments in the amount established by the 2009 TPP. (Def. SMF Ex. B at 83:24-84:10, 156:9-10; Pl. Ex. T at 6:12-23 ("So, I have been in a modification, I'm still in a modification, for ten months, I received something that said I was in a modification.")). Bank of America accepted those payments and, when the "unapplied total" funds met or exceeded the amount of her original, $2,400.49 monthly

payment, it applied those funds to her loan balance. (Def. SMF Ex. C at 6; Pl. SMF Ex. P at 6-10; *see* U.S. Dep't of the Treasury, *Supplemental Directive 09-01: Introduction of the Home Affordable Mortgage Program* at 18 (Apr. 6, 2009)).

In the summer of 2013, Nickerson-Reti decided to sell her house and move to California to be with her son, who was starting college there. (Def. SMF Ex. B at 17:11-15, 171:13-172:1). She testified that she would have preferred to rent out the house while she was in California, but that, because of the parties' differing opinions on the state of the modification, she was being threatened with foreclosure. According to her, a representative of the bank named Mary Long told her that if she left "[w]e will take your house." (Def. SMF Ex. B at 171:21-172:7).

In 2013, the Middlesex Superior Court issued a preliminary injunction ordering Bank of America to release the lien on the house in exchange for the disputed funds being placed in escrow. Nickerson-Reti then sold her house for $700,000 on August 28, 2013. (Def. SMF Ex. B at 172:10-14).

Nickerson-Reti testified that her disagreement with the bank as to whether her mortgage loan had been modified caused her various forms of injury. Specifically, she contends that if she had known she was not receiving a HAMP modification, she would have shopped around to other banks for better refinancing offers than she received from Bank of America; that her account accrued fees; that she was forced to sell her house when she did not want to; that the inconvenience of doing so was significant; that she could have sold her house for more money if the real-estate listing websites Trulia and Zillow had not listed the house as pre-foreclosure and she had not been seen as "desperate"; that she sustained damage to her reputation; that her credit-card issuers kept lowering her credit limit; that the drop in her credit score made it impossible for her to find housing in California; and that as a result she was "homeless, spending months and

months in absolutely beastly hotels," and that when she did find a "'no questions asked' kind of landlord" she was later assaulted and stalked by him and made homeless again. (Def. SMF Ex. B at 173:14-16, 174:5-177:18, 180:6-10; 185:19-186:15, 188:7-9, 190:10-17). She also testified that she has suffered severe emotional distress, in the form of depression and PTSD, resulting from her interactions with Bank of America. (*Id.* Ex. B at 190:18-197:9).

### B. Procedural Background

Plaintiff filed this lawsuit in state court on August 16, 2013. On August 26, the Middlesex Superior Court entered a preliminary injunction requiring defendant to (1) release its mortgage lien on plaintiff's property in exchange for $377,530.73 from the sale of the property and (2) place all other funds which defendant contended were due with the Court to be held pending adjudication of the action. (Def. SMF Ex. A). Defendant removed the action to federal court on September 20.

Defendant filed a motion to dismiss the complaint for failure to state a claim on December 13, 2013. Plaintiff responded by filing an amended complaint on December 30. Defendant filed a motion to dismiss the amended complaint on February 12, 2014. Subsequently, plaintiff's counsel withdrew, and plaintiff requested leave to file a second amended complaint. On June 26, 2014, the Court granted plaintiff's motion for leave to file the second amended complaint as to Count 3 (breach of the TPP Agreement); Count 4 (breach of the implied covenant of good faith and fair dealing); Count 5 (promissory estoppel); Count 6 (violation of Mass. Gen. Laws ch. 93A); and Count 9 (fraud). Defendant answered that complaint, and a scheduling order was issued on September 12.

After that, plaintiff became unreachable, and the Court dismissed the case for failure to prosecute on January 1, 2015. Plaintiff reappeared and filed a motion to vacate the dismissal on March 10, which the Court granted on May 15. A new scheduling order was issued on May 19.

On May 25, 2016, new counsel entered an appearance on behalf of plaintiff.  Almost a year later, on June 12, 2017, the case was referred to mediation.  On July 27, the mediator reported that mediation had not been successful, but that the parties might return to mediation before trial if feasible.  Following the mediation, the Court set August 30, 2017, as the final deadline for dispositive motions.

The present summary judgment motion was filed by Bank of America on August 30, 2017, four years after this action was initiated.  Plaintiff did not file a timely opposition, which was due on September 20.  She did, however, file a response to the statement of material facts on December 6.  On December 11, the morning of the hearing on defendant's motion, plaintiff filed an Opposition Memorandum to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment, along with Additional Material Facts in Support of the Cross-Motion for Summary Judgment and several exhibits.  A hearing on the motion was held later that day.

## II.     Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256–57.

### III.    Analysis

#### A.        Timeliness of Plaintiff's Filings

On December 11, 2017, the day of the summary judgment hearing, plaintiff cross-moved for summary judgment.  According to the Court's scheduling order, dispositive motions were due August 30, 2017.  Plaintiff never asked for an extension of time, either before or after the deadline passed.  And she was represented by counsel, who was certainly aware of the deadline. Therefore the Court will not consider whether plaintiff is entitled to summary judgment on her cross-motion, and will deny that motion as untimely.

Plaintiff also filed an opposition to the motion for summary judgment on December 11, 2017, the day of the hearing.  Defendant filed its motion for summary judgment on August 30, 2017.  According the Local Rules, plaintiff's response was due 21 days later, on September 20. L.R. 56.1.  Plaintiff did not request an extension of time.  Instead, and without apology, she filed an opposition on December 11, 2017, more than eleven weeks late.

"The mere fact that plaintiff failed to file a timely opposition does not mean that defendant's Rule 56 motion should be granted."  *Mendez v. Banco Popular de Puerto Rico*, 900 F.2d 4, 7 (1st Cir. 1990).  "Whether or not opposed, summary judgment can only be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Carmona v. Toledo*, 215 F.3d 124, 134 n.9 (1st

Cir. 2000) (quoting Fed. R. Civ. P. 56 (c)); *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment *if the motion and supporting materials—*including the facts considered undisputed*—show that the movant is entitled to it*." (emphasis added)). And "even where a motion for summary judgment is unopposed, a district judge is still bound to review the case on the merits based on the uncontroverted facts before him." *Cordi-Allen v. Halloran*, 470 F.3d 25, 28 (1st Cir. 2006). But "in the absence of a timely response . . . , the district court c[an] 'accept as true all material facts set forth by the moving party with appropriate record support.'" *De la Vega v. San Juan Star, Inc.*, 377 F.3d 111, 118-19 (1st Cir. 2004) (quoting *Jaroma v. Massey*, 873 F.3d 17, 21 (1st Cir. 1989)).

The opposition memorandum is late, and the Court will not consider it as a general matter. Because the facts of this case are complex, contested, and span many years, and because the Court has an obligation to consider the facts, the Court will consider the exhibits submitted with the plaintiff's statement of material facts. Furthermore, because the opposition memorandum did not address plaintiff's claim of an oral agreement to modify her mortgage, the Court will consider that claim to have been waived.

> **B.**     **Defendant's Motion for Summary Judgment**
>
> > **1.**     **Counts 3 and 4:  Breach of Contract and Breach of Implied Covenant**

Plaintiff and defendant had, of course, a contractual relationship at all relevant times. Plaintiff borrowed $417,000 from defendant, and she promised to pay it back, with interest, over thirty years. She breached that promise when she failed to make her regular monthly mortgage payments. She alleges that she and the defendant entered into a new contract, the Trial Payment Period Plan, and that defendant breached the new contract by failing to modify her mortgage.

In order to establish a claim for breach of contract in Massachusetts, a plaintiff must prove "that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997).

Defendant argues that plaintiff cannot prevail on her breach-of-contract claim because (1) any modification of the mortgage is governed by the statute of frauds, and there is no writing signed by defendant; (2) plaintiff did not provide the required documentation to qualify for the TPP; (3) the language of the TPP requires defendant's signature for a modification to be binding; and (4) even if the TPP were enforceable and defendant breached it, plaintiff has not suffered any harm. Because the Court concludes that no contract was created, it does not reach the issue of injury.

### a.    **Statute of Frauds**

The Massachusetts statute of frauds provides in relevant part as follows:

> No action shall be brought . . . [u]pon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.

Mass. Gen. Laws. ch. 259, § 1. Defendant, citing *Hosseini v. Capital One, N.A.*, 217 F. Supp. 3d 441 (D. Mass. 2016), contends that the request to modify a mortgage falls within the statute of frauds, and therefore, because defendant never signed the TTP, the statute of frauds bars plaintiff's claim.

There appears to be conflicting authority as to whether the type of mortgage modification alleged here—namely, a reduction in interest rate and corresponding reduction in the amount of each monthly payment—is one that falls under the statute of frauds. In *Hosseini*, the plaintiff alleged that he entered into an oral agreement with a representative of the bank whereby he

would make three reduced monthly payments and the bank would modify the amount of his mortgage loan. The *Hosseini* court held that his claim was barred by the statute of frauds because "a contract affecting a mortgage falls squarely within the Statute." 217 F. Supp. 3d at 452 (quoting *French v. Chase Bank, N.A.*, 2012 WL 273724, at *2 (D. Mass. Jan. 31, 2012)). It cited two Massachusetts cases, neither of which are squarely on point; both deal with the partial release of mortgages, not merely the modification of the payment terms. *Duff v. U.S. Trust Co.*, 327 Mass. 17, 20 (1951); *Metro. Credit Union v. Matthes*, 46 Mass. App. Ct. 326, 334 (1999). Similarly, the Massachusetts cases cited by the *French* court also refer to mortgage modifications going beyond the terms of the payment schedule. *Linsky v. Exch. Trust Co.*, 260 Mass. 15, 17 (1927) (mortgage assignment); *Montuori v. Bailen*, 290 Mass. 72, 75 (1935) (oral promise not to foreclose under mortgage); *see also Hachikan v. Fed. Deposit Ins. Corp.*, 914 F. Supp. 14, 17 (D. Mass. 1996) (complete discharge of mortgage debt).

Other cases have held that "because the alleged contract concerns a modification to the mortgage payment terms, rather than to the underlying interest in the land, the Massachusetts statute of frauds does not bar this Court from considering the existence and potential breach of a non-written contract." *Arago v. Mortg. Elec. Registration Sys., Inc.*, 22 F. Supp. 3d 133, 139 n.6 (D. Mass. 2014) (citing *Akar v. Fed. Nat'l Mortg. Ass'n*, 845 F. Supp. 2d 381, 397 (D. Mass. 2012)). *Arago* cited *Siegal v. Knott*, 316 Mass. 526 (1944), which stated the following:

> The agreement changed the method of paying an indebtedness owed to the defendant, which was evidenced by a note; and although the note was secured by a mortgage upon real estate, the mortgage was only an incident to the debt and the defendant after the agreement was made continued to hold the mortgage as security for the satisfaction of the debt. The defendant's right, title and interest in the security were unaffected by the agreement. Even if a default in a monthly payment could not occur by virtue of the agreement for a month later than the time originally fixed for such payment and so the mortgage could be considered as having been extended for the period of a month, yet an agreement having that effect does not come within the statute of frauds.

*Id.* at 529; *see also Mack v. Wells Fargo Bank, N.A.*, 2011 WL 4837261, at *5-6 (Mass. Super. Ct. Aug. 31, 2011) (holding that HAMP modifications not barred by statute of frauds).

According to the terms of the TPP, any contemplated eventual HAMP modification agreement *would* modify the mortgage itself, and not just the note, and therefore would have to be in writing. (Def. SMF Ex. C at 5 ("If I am in compliance with this Trial Period Plan . . . the Servicer will provide me with a Home Affordable Modification Agreement . . . that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.")). However, it is not clear whether the TPP itself affects the mortgage at all. On the one hand, the servicer promises to suspend any scheduled foreclosure sale until the TPP terminates. (*Id.* Ex. C at 6). But the TPP makes clear that it is not a modification of the loan (or the mortgage), but rather preparatory to a modification of the loan. (*See id.* Ex. C at 6 ("If prior to the Modification Effective Date, (i) the Servicer does not provide me a fully executed copy of this Plan and the Modification Agreement . . . the Loan Documents will not be modified and this Plan will terminate."); *id.* Ex. C at 7 ("I understand that the Plan is *not* a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Moderation Agreement, and (iii) the Modification effective date has passed." (emphasis added); *id.* Ex. C at 7 ("[N]othing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents.")).

Therefore, to the extent plaintiff contends that she had a fully enforceable, permanent modification of her loan and mortgage, the statute of frauds bars that claim. However, the statute of frauds does not apply to the TPP, which is not an agreement to modify the loan or the mortgage.

### b.  Denial for Failure to Provide Documents

Defendant next argues that plaintiff did not submit the necessary documents to qualify for a TPP.  However, there is a genuine dispute of material fact as to whether she in fact submitted those documents.

First, defendant correctly notes that plaintiff did not send a quarterly or year-to-date profit/loss statement from her independent consulting work.  She contends that she never had any such document, that she submitted Schedule Cs from her tax returns that contain that information, and that she spoke to someone on the phone who said that the documents she submitted met the requirement.  If true, defendant may be estopped from arguing that plaintiff breached the contract by failing to submit that document.

There is a further dispute concerning her child-support payments.  As a general matter, borrowers are not required to use child-support income to qualify for HAMP.[7]  Neither party has provided the Court with plaintiff's full application, or even her Request for Modification and Affidavit, which presumably would detail the income on which she was relying.  Nonetheless, it seems clear that plaintiff was relying on child-support income in her April 2009 request:

> Q.  [T]his [personal budget worksheet] was submitted for the purpose of obtaining the HAMP modification?
>
> A.  This one was, yeah.
>
> Q.  Okay.  And your income in April 20, 2009 was $34,448 a year with child support of $19,968?
>
> A.  That's what it says.

---

[7] The checklist included with the TPP offer only requests documentation of child-support payments for borrowers who are "relying on alimony or child support as qualifying income."  (Def. SMF Ex. C at 4); *see* U.S. Treasury Dep't, *Supplemental Directive 09-07:  Home Affordable Modification Program—Streamlined Borrower Evaluation Process*, at 5, Ex. A (Oct. 8, 2009) ("You are not required to disclose Child Support, Alimony or Separation Maintenance income, unless you choose to have it considered by your servicer.").

Q.  Okay.  And did you write that number in there?

A.  I did.

(Def. SMF Ex. B at 113:24-115:1).

Because she was relying on child-support payments as qualifying income, the TPP checklist required her to submit (1) a "[c]opy of [the] divorce decree, separation agreement or other written agreement or decree that states the amount of the . . . child support and period of time over which it will be received," and (2) "[p]roof of full, regular and timely payments; for example, deposit slips, bank statements, court verification, or filed federal tax return with all schedules."  (Def. SMF Ex. C at 4)  As to the first item, plaintiff testified that she could not provide that type of documentation because she was not in fact divorced, and there was no court order or divorce decree governing those payments.  If true, of course, she could not have submitted such a document to the bank.  As to the second item, plaintiff contends that she did provide her tax return to the bank, on multiple occasions.  In addition, one of the bank's witnesses acknowledged that she provided five checks made out to her from her husband, with the notation "child support" in the memo, with her original application.  (Def. SMF Ex. E at 95:15-96:1).

The bank appears to have taken inconsistent positions as to this issue.  Anderson, the bank's Rule 30(b)(6) witness, testified that the child-support documentation was incomplete.  (Def. SMF Ex. E at 97:15-98:12).  But neither the July 30, 2010 letter listing the missing documents, nor Winkler at his expert deposition, mentioned any failure to provide documentation for child support.  (*See* Def. SMF Ex. F at 1; Pl. SMF Ex. X at 40:2-9)  Furthermore, plaintiff alleges that Scott, a bank representative, told her that she had submitted all the relevant documents for her 2009 HAMP application, but that her application was terminated because a subset of them were not signed and dated.  (Pl. SMF Ex. T).

In short, there appears to be a genuine issue of material fact as to whether the documentation of the child-support income that plaintiff submitted was adequate to verify the income for the purposes of her HAMP application. Summary judgment on that basis is therefore inappropriate.

### c.    <u>Lack of Signature by Defendant</u>

Defendant further argues that the TPP, by its terms, is not an enforceable contract, because it never countersigned the document. It points to the following language in the TPP: "This Plan will not take effect unless and until both I and the Servicer sign it and Servicer provides me with a copy of this Plan with the Servicer's signature." (Def. SMF Ex. C at 5).[8]

As an initial matter, plaintiff contends that the bank did in fact countersign the TPP, or at a minimum that there is a factual dispute as to that issue. But plaintiff has submitted no actual evidence showing or even suggesting that the bank signed the document. The undisputed evidence, therefore, is that the bank did not sign the TPP, and it certainly did not return a copy to plaintiff as required by the TPP's terms. The basic question is thus whether a contract was formed, even without the bank's signature.

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878

---

[8] The sentence immediately prior reads as follows: "I understand that after I sign and return two copies of this Plan to the Servicer, the Servicer [1] will send me a signed copy of this Plan *if* I qualify for the Offer *or* [2] will send me written notice that I do not qualify for the Offer." (Def. SMF Ex. C at 5 (emphasis and numbering added)). Somewhat confusingly, the TPP further provides: "If prior to the Modification Effective Date, (i) the Servicer does not provide me a fully executed copy of this Plan and the Modification Agreement . . . the Loan Documents will not be modified and this Plan will terminate," suggesting that there is something to "terminate" even if the homeowner never receives a signed copy of the TPP. (*Id.* Ex. C at 6). Although it's not immediately clear what that something is, what is clear is that absent receipt of a copy of the TPP signed by the bank, whatever it is it will be terminated, such that there is nothing to enforce.

(2000). "An offer is the manifestation of willingness to enter into a bargain made in such a way as to justify the other person in understanding that his assent will conclude the agreement." *I&R Mech., Inc. v. Hazelton Mfg. Co.*, 62 Mass. App. Ct. 452, 455 (2004) (quoting Restatement (Second) of Contracts § 24 (1981)). "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26 (1981); *see Schwanbeck v. Federal-Mogul Corp.*, 412 Mass. 703, 706 (1992) ("It is a settled principle of contract law that '[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.'" (alteration in original) (quoting *Kuzmeskus v. Pickup Motor Co.*, 330 Mass. 490, 493 (1953))); *see also* 1 Corbin on Contracts § 1.11 (1993) ("So long as it is reasonably apparent that some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer."). "A written contract, signed by only one party, may be binding and enforceable even without the other party's signature," but only "if the other party manifests acceptance." *Haufler v. Zotos*, 446 Mass. 489, 498-99 (2006).

Here, the TPP provided that (1) *if* plaintiff made three monthly payments at the lower rate, and (2) *if* she provided the requested documents, and (3) *if* she signed and returned a copy of the TPP, and (4) *if* her representations continued to be true in all material respects, and (5) *if* the bank countersigned the TPP and returned it to her, *then* (6) the bank would provide her with an agreement modifying the terms of her loan. The TPP clearly states that it "will not take effect" unless the bank signs it and provides a signed copy to the borrower—in other words, performance of items (1)-(4) by the borrower would not be effective to modify the loan.

There is no ambiguity in that language, and therefore no reason to consider external evidence as to its meaning. *General Convention of New Jerusalem in the U.S. of Am., Inc. v. MacKenzie*, 449 Mass. 832, 835 (2007) ("When the words of a contract are clear, they must be construed in their usual and ordinary sense . . . .").[9] And if a countersignature were not necessary to create such a contract, the language would be superfluous at best; indeed, such a holding would run directly contrary to that language. Such an interpretation cannot be correct. *See Starr v. Fordham*, 420 Mass. 178, 192 (1995).[10] Thus, it is clear that the TPP is not an *offer*, but rather an *invitation* for the borrower to make an offer along the lines of the terms outlined, which the bank is then empowered to accept by way of countersigning and returning the document.

Such a contractual requirement is not remarkable; the requirement of a countersignature is a common mechanism employed to signal that a party does not wish to be bound until it has made a further manifestation of assent. *Kuzmeskus*, 330 Mass. at 491-93 (where contract stated "[t]his order is not binding unless authorized by an officer of the company" and included a blank space for officer's signature there was no contract because "defendant made it clear to the

---

[9] "It is . . . elementary that an unambiguous agreement must be enforced according to its terms." *Schwanbeck*, 412 Mass. at 706. Where a contract is contradictory or ambiguous, extrinsic evidence may be used to aid in its interpretation. *Gen. Convention of New Jerusalem*, 449 Mass at 835-36; *see also Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 237 (1st Cir. 2013) (explaining that, where there is ambiguity in the TPP, "the Treasury Department's guidelines to mortgage servicers on how to apply HAMP[] may be helpful" in resolving it); *James B. Nutter & Co. v. Estate of Murphy*, 478 Mass. 664, 669-70 (2018) (explaining that with contracts of adhesion, the court must seek to effectuate not the actual intentions of the parties in the transaction, but the "meaning an objectively reasonable person in the nondrafting party's position would give to the language in the contract").

[10] "A contract 'must . . . be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose.'" *Brillante v. R.W. Granger & Sons, Inc.*, 55 Mass. App. Ct. 542, 548 (2002) (quoting *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991)). "'[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'" *Starr*, 420 Mass. at 192 (quoting Restatement (Second) of Contracts § 203(a) (1981)); *see also Computer Sys. of Am., Inc. v. W. Reserve Live Assur. Co. of Ohio*, 19 Mass. App. Ct. 430, 437-38 (1985) ("Applicable here is the canon of construction that every word and phrase of a contract should, if possible, be given meaning, and that none should be treated as surplusage if any other construction is rationally possible.").

plaintiff that it did not intend to be presently bound, and on his part the plaintiff could not have expected to be bound until the proposed sales were subsequently authorized in accordance with the imposed conditions"); *see Brown v. OneWest Bank, FSB*, 2014 WL 3953088, at *2 (Mass. App. Ct. Aug. 14, 2014) (holding that proposed mortgage modification was not an offer the borrower could accept by signing where the proposal "expressly reserved the right to determine whether the plaintiff qualified for the proposed modification, and once it determined that plaintiff did not qualify, never signed or otherwise accepted the proposed modification").  Here, the bank has a legitimate reason to require a countersignature:  to avoid this very type of circumstance, where there is ambiguity as to whether a contract has been formed.

At least two circuits have held that the bank's signature on TPP agreements with similar (if not identical) language to the one at issue here is required to form a binding contract.  *See Goss v. ABN AMRO Mortg. Grp.*, 549 F. App'x 466, 470-72 (6th Cir. 2013) (interpreting Michigan law); *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548, 552-55 (5th Cir. 2012) (interpreting Texas law).[11]  Although discussing applicable state law, the reasoning in those cases relies on basic contract principles applicable in Massachusetts.  *See Goss*, 549 F. App'x at 470 ("In Michigan, a loan modification proposal 'd[oes] not ripen into a binding agreement' if the modification agreement bears the signature of the borrower but not the lender because such a proposal 'does not objectively reflect a meeting of the minds regarding the essential modification

---

[11] The TPP at issue in this case is a uniform instrument, created by Fannie Mae and Freddie Mac.  (Def. SMF Ex. C at 5-7 ("HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3156 3/09 (rev. 8/09)."); Freddie Mac, *Bulletin 2009-10 Ex. A, Chapter C65: Home Affordable Mortgage Program* at 5 (Apr. 21, 2009), http://www.freddiemac.com/singlefamily/guide (referring to Form 3156).  "Uniform agreements or clauses are afforded 'one uniform meaning rather than multiple inconsistent meanings.'"  *Johnson v. Indymac Mortg. Servicing*, 2014 WL 1652594, at *7 (D. Mass. Arp. 22, 2014) (citing *Kolbe v. BAC Home Loans Servicing LP*, 738 F.3d 432, 436 (1st Cir. 2013) (explaining that the TPP contract is a "uniform instrument" created by the government and relying on other courts' interpretations of TPPs)).

terms.'" (alteration in original) (quoting *Voydanoff v. Select Portfolio Servicing, Inc.*, 2011 WL 6757841, at *7 (Mich. Ct. App. Dec. 22, 2011))); *Pennington*, 493 F. App'x at 554 ("The Penningtons' claim for breach of the TPP fails for an even more basic reason: Their TPP did not form a contract, because the bank never expressed an intent to be bound. The TPP expressly requires that before the contract is final, the lender must send a signed copy to the borrower." (footnote omitted)).[12]

The Seventh Circuit's decision in *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012), is in accord. In that case, the bank *did* return a signed copy of the TPP to the borrower, but never sent her a modification agreement. *Id.* at 558. The Seventh Circuit concluded that, having signed the TPP, the bank was obligated to offer the borrower a permanent modification as long as she was in compliance with the TPP and her representations continued to be true. *Id.* at 562. It explained that "when Wells Fargo executed the TPP, its terms included a unilateral offer to modify Wigod's loan conditioned on her compliance with the stated terms of the bargain." *Id.* Importantly, the Court acknowledged that prior to signing the TPP, the bank was free to determine that the borrower did not qualify for the modification:

> At the beginning, when Wigod received the unsigned TPP, she had to furnish Wells Fargo with "documents to permit verification of . . . [her] income . . . to determine whether [she] qualif[ied] for the offer." TPP ¶ 2. The TPP then provided: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan *if I qualify for the Offer* or will send me written notice that I do not qualify for the offer." TPP ¶ 2 (emphasis added). Wigod signed two copies of the Plan on May 29, 2009, and returned them along with additional financial documentation to Wells Fargo.
>
> Under the terms of the TPP Agreement, then, that moment was Wells Fargo's opportunity to determine whether Wigod qualified. If she did not, it could have and should have denied her a modification on that basis. Instead, Wells Fargo

---

[12] District courts have arrived at similar holdings. *See e.g.*, *McGann v. PNC Bank, Nat'l Ass'n*, 2013 WL 1337204, at *6 (N.D. Ill. Mar. 29, 2013); *Fed. Home Loan Mortg. Corp. v. Hassell*, 2013 WL 823241, at *6 (E.D. Mich. Mar. 6, 2013).

countersigned on June 4, 2009 and mailed a copy to Wigod with a letter congratulating her on her approval for a trial modification. In doing so, Wells Fargo communicated to Wigod that she qualified for HAMP and would receive a permanent "Loan Modification Agreement" after the trial period, provided she was "in compliance with this Loan Trial Period and [her] representations . . . continue[d] to be true in all material respects." TPP ¶ 1.

*Id.* at 562 (alterations in original).[13]

It is true that courts in this district have stated that a TPP itself constitutes an offer that can be accepted by a homeowner without further action on the part of the offeror. In *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342 (D. Mass. 2011), the court held that "the TPPs were offers, and that plaintiffs' signatures and subsequent monthly payments under the terms of the TPP constituted acceptance of those offers." *Id.* at 351. In *Durmic v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 4825632 (D. Mass. Nov. 24, 2010), the plaintiffs did not receive executed copies of the TPP from the bank, but the court declined to dismiss the breach-of-contract claim. *Id.* at *1-2, *4; *see also Johnson v. Indymac Mortg. Servicing*, 2014 WL 1652594, at *7 (D. Mass. Apr. 22, 2014); *Conte v. Bank of America, N.A.*, 52 F. Supp. 3d 265, 268 (D. Mass. 2014); *Stagikas v. Saxon Mortg. Servs., Inc.*, 795 F. Supp. 2d 129, 136 (D. Mass. 2011).

None of those cases, however, explicitly address the question of whether the bank's

---

[13] Citing *Wigod*, the Ninth Circuit has held that even an unsigned TPP can oblige the Bank to modify a borrower's loan as long as the borrower is in compliance with the terms of the TPP. *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 883 (9th Cir. 2013). In its view, *Wigod* turned not on the fact that the bank signed and returned the TPP, but on the fact that it failed to notify the borrower that she did not qualify. *Id.* at 884-85. But that is a misreading of *Wigod*. *Wigod* clearly acknowledges that the bank's signature on the TPP is what obligated it to follow through with a modification agreement. *Wigod* rejected the idea that, following the return of the signed TPP, the bank could retain the discretion to simply not send a modification agreement regardless of whether the borrower was in compliance. *Wigod*, 673 F.3d at 563. But it acknowledged that, according to the settled principles of contract law, "when the promisor conditions a promise on *his own* future action or approval, there is no binding offer," and that "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Id.* at 561-62 (quoting Restatement (Second) of Contracts § 26 (1981)). Surely, the statement that the TPP will not be binding until the bank signs and returns a copy is a condition tied to the bank's own actions, rendering the unsigned TPP subject to further manifestation of intent and therefore not an offer under that reasoning (as opposed to a promise dependent on the actions of third parties, which may be an enforceable contract that does not give the promisor unilateral discretion to back out).

signature is required. *Bosque* and *Conte* do not even mention whether the borrowers received a signed TPP from the bank. The bank in *Durmic* argued only lack of consideration, lack of damages, and absence of essential terms. 2010 WL 4825632, at *2-4. The bank in *Statigas* argued only lack of consideration. 795 F. Supp. 2d at 136. And in *Johnson*, the bank conceded that the TPP was a contract for the purposes of summary judgment. 2014 WL 1652594, at *9. In any event, although the case law on this question is muddled and somewhat split, it seems clear that a contract cannot be formed without the lender's countersignature.

In short, the bank did not countersign the TPP and return a signed copy to plaintiff. Because the TPP language clearly states that it would not "take effect" without such a signature it was not an offer; plaintiff could not, by signing it, accept it; and so no contract between the parties was ever formed. Accordingly, summary judgment will be granted as to Count 3, the breach of contract claim. And because there is no valid contract, there can be no claim for breach of the implied covenant of good faith and fair dealing. *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005). Therefore, the Court will also grant defendant summary judgment on Count 4.

### 2. Count 5: Promissory Estoppel

Count 5 asserts a claim for promissory estoppel. Promissory estoppel requires "(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Anzalone v. Admin. Office of the Trial Court*, 457 Mass. 647, 661 (2010) (quoting *Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Ct.*, 448 Mass. 15, 27-28 (2006)).

Plaintiff, of course, had a pre-existing obligation to pay her mortgage. Nonetheless, she contends that she detrimentally relied on the bank's representation that if she complied with the

three requirements of the TPP offer (making three lower payments, sending the required documents, and not having a material change in circumstances), the bank would modify her mortgage. She contends that the detriment she suffered was that if she had known that she was not going to receive the modification, she would have shopped around for a different refinancing arrangement.

The basic problem with that position is that it would render the contractual requirement of a bank countersignature completely irrelevant. Put another way, she seeks to recover under a theory of quasi-contract as end-run around the specific requirements of the TPP. Under the circumstances, plaintiff did not reasonably rely on any representation by the bank. Indeed, it was unreasonable for her to think that bank would unconditionally modify her mortgage when she never received a countersigned agreement back from the bank, and the TPP specifically states that such a signature is required for the agreement to take effect. *See Brown*, 2014 WL 3953088, at *2-3 (holding that borrower's promissory estoppel theory lacked merit because the "proposed modification clearly was dependent on [the bank's] determination that the plaintiff met its requirements, or a subsequent execution of the agreement, neither of which occurred" and so "plaintiff's reliance was unreasonable as a matter of law"); *cf. I&R Mech.*, 62 Mass. App. Ct. at 459 ("'If the addressee of a proposal has reason to know that no offer is intended, there is no offer even though he understands it to be an offer. "Reason to know" depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business.'" (quoting Restatement (Second) of Contracts § 26 cmt. a (1981))). Accordingly, summary judgment as to Count 5 will be granted to defendant.

### 3. Count 6: Chapter 93A

Count 6 asserts a claim under the Massachusetts consumer protection statute, Mass. Gen.

Laws ch. 93A, § 2(a).  The complaint alleges generally that "[d]efendant, knowingly and willingly, made false, deceptive and misleading statements and omissions about material aspects of the goods and services described herein."  (2d Am. Compl. ¶ 148, ECF 46).  It further alleges:

> Defendant's unfair, deceptive, and unconscionable conduct included, but is not limited to 1) failing to process Plaintiff's HAMP application in a timely fashion according to its stated time frame; 2) failing to provide accurate and timely information to Plaintiff regarding the status of her loan and the loan modification; 3) demanding that Plaintiff provide information which she already had supplied; 4) engaging in collection activity, reporting negative credit information concerning Plaintiff to consumer reporting agencies; 5) assessing loan interest, fees, and other charges that were not in fact owed and by 6) attempting to collect same; and failing to provide Plaintiff with a permanent HAMP modification even though Plaintiff satisfied all the requirements for same.

(*Id.* ¶ 150).

"To prevail on a Chapter 93A claim, the plaintiff 'must prove that a person who is engaged in trade or business committed an unfair or deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a result.'" *Morris v. BAC Home Loan Servicing, L.P.*, 775 F. Supp. 2d 255, 259 (D. Mass. 2011) (alteration in original) (quoting *Brandon Assocs., LLC v. FailSafe Air Safety Sys. Corp.*, 384 F. Supp. 2d 442, 446 (D. Mass. 2005)).  "Although Chapter 93A does not specifically define 'unfair' or 'deceptive,' the Massachusetts courts have applied a three-step analysis to determine whether conduct is unfair under the Act.  They consider '(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers.'" *Morris*, 775 F. Supp. 2d at 261 (citing *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005)).

As to false or deceptive statements, plaintiff testified that bank representatives assured her that if she did her part and complied with the TPP her loan would be modified.  (Def. SMF

Ex. B at 88:16-18, 148:20-23, 165:23-24).  She testified that bank employees on the phone told

her that she should ignore notices telling her that documentation was missing.  (*Id.* Ex. B at

122:12-22).  And she testified that defendant sent her statements for eight months telling her that

she was in a trial modification period pursuant to the TPP.  (*Id.* Ex. B at 86:16-17).  As discussed

above, the bank has successfully argued that it had no obligation to modify her mortgage

regardless of whether she submitted the correct documentation.  Under the circumstances, a

reasonable factfinder could find that the bank made false statements to plaintiff.  *See Young v.*

*Wells Fargo Bank, N.A.*, 828 F.3d 26, 33 (1st Cir. 2016) ("*Young II*") ("Normally, a party's

testimony, 'containing relevant information of which [she] has first-hand knowledge, . . . is . . .

competent to support or defeat summary judgment.'" (alterations in original) (quoting *Cadle Co.*

*v. Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997))).  False statements about a borrower's eligibility

for a HAMP modification have been held to be unfair or deceptive practices under Chapter 93A.

*E.g.*, *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 186 (D. Mass. 2011) (and cases

cited); *Brown v. Bank of Am., N.A.*, 67 F. Supp. 3d 508, 515-16 (D. Mass. 2014) (and cases

cited).

    As to the failure to process her application quickly, defendant is correct that such a failure

is at worst negligence and at best unremarkable in the absence of any obligation to process

plaintiff's application in any specified time frame.  *See Klairmont v. Gainsboro Restaurant, Inc.*,

465 Mass. 165, 176-77 (2013) ("[I]t bears emphasizing that at least in the absence of conduct

that qualifies as unfair or deceptive, a negligent act or acts, alone, do not violate c. 93A.").  But

plaintiff testified that the bank repeatedly lost her application and required that she supply

information she had already given them.  She testified that she was given conflicting information

about the status of her modification and whether the bank had in fact received all the documents

it required; that is corroborated, to some extent, by the conflicting statements on that topic from the July 30, 2010 letter, the testimony of Winkler, and the recorded call from Scott. Plaintiff has also provided sworn statements from Bank of America employees made in connection with a different Massachusetts lawsuit that employees were instructed to delay action on applications by claiming that documents were missing when they were not or by claiming that the file was under review when it was not, and then, after the homeowner was finally rejected, offer him or her a more expensive, in-house modification. (Pl. SMF Ex. W (Decls. of William E. Wilson Jr., Simone Gordon, and Theresa Terrelonge); *see* Def. SMF Ex. B at 187:13-17 (plaintiff's testimony that defendant tried to steer her toward expensive in-house modifications several times)). They testified that case managers and underwriters were ordered to "clean out" the backlog of HAMP applications by denying any file in which the financial documents were more than 30 or 60 days old, even when the homeowner had provided all required documents and fully complied with the TPP, and justify the denial by claiming that the homeowner had failed to return the requested documents. (Pl. SMF Ex. W). Taken together, that is sufficient evidence from which a reasonable factfinder could conclude that the bank engaged in unfair and deceptive practices as to plaintiff's HAMP application, regardless of whether she had any contractual right to a permanent modification.

Finally, defendant contends that plaintiff has not proved that any allegedly unfair or deceptive acts caused her economic injury. "To establish causation, a plaintiff must 'prove that the defendant's unfair or deceptive act caused an adverse consequence or loss.'" *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) (quoting *Rhodes v. A.I.G. Domestic Claims, Inc.*, 641 Mass. 486 (2012)); *see also* Mass. Gen. Laws. ch. 93A, § 11; *Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 502-04 (2013). Defendant contends that "any harm plaintiff claims (*i.e.*, her

ineligibility for a permanent loan modification and alleged damage to her credit) is the result of her own failure to repay her mortgage loan as she originally agreed." (Def. Mot. for Summ. J. at 19).

Plaintiff has presented sufficient evidence to show that she has suffered some form of injury. Among other things, she testified that her account accrued fees, that she was forced to sell her house when she did not want to for less than its market value, and that her credit score suffered. These kinds of injuries have been held to be sufficient in the context of Chapter 93A. *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 241-42 (1st Cir. 2013) ("*Young I*") (loss of equity in home and damage to credit rating); *Brown*, 67 F. Supp. 3d at 517 (increased interest rate, loss of opportunity to refinance, and forced sale of home).

Any such injuries must, of course, have been caused by the bank's deceptive conduct, as opposed to her failure to meet her obligations under her original loan or her personal choices. *See Young II*, 828 F.3d at 34-35. While there is no question that her default contributed substantially to her claimed injuries, plaintiff has presented sufficient evidence from which it could be reasonably inferred that she suffered additional injury from the bank's conduct. She contends, among other things, that the false and conflicting information she received from the bank and the bank's practice in forcing her to continually resubmit her documents—rather than simply denying her, once and for all, for a substantive reason—caused her to continue working with the bank in pursuit of a HAMP modification as opposed to seeking a different resolution. (Def. SMF Ex. B at 185:19-187:23).[14] To be sure, plaintiff will have to show that the specific

_____

[14] Plaintiff testified:

If they had honestly told me when I filed the first application that they had no intention of actually moving forward and helping me, I would have tried to go to a different bank and get a different loan. . . . And if they had told me that they were going to lose the second [HAMP application], if they were—if they had told me that I was going to spend hours and hours and hours on hold only to get dropped on the phone, I would have gone somewhere else. But once they told me that they

injuries she claims are reasonably attributable to the bank's conduct.  Nonetheless, it appears that a reasonable factfinder could find that defendant's actions caused her some degree of injury over and above the injury caused by her own actions.  Therefore, defendant's motion for summary judgment as to Count 6 will be denied.

### 4.    <u>Count 9:  Fraud</u>

Count 9 asserts a claim for fraud.  There are two allegedly fraudulent statements are at issue:  an October 27, 2009 statement by a bank employee, Ann Stollee, that a $900.49 payment would resolve plaintiff's default on the loan; and a November 9, 2009 statement by another bank employee, "Brendan," that "it's no big deal if it goes into foreclosure; Patrick can change that." (2d Am. Compl. ¶¶ 169-72, ECF 46; Mem. & Order on Pl.'s Mot. for Leave to File & Def.'s Mot. to Dismiss at 24-25, ECF 47).

The limitations period for fraud claims is three years.  Mass. Gen. Laws ch. 260, § 2A. Therefore, the limitations periods on those statements expired on October 27, 2012, and November 9, 2012, respectively.  Because plaintiff did not initiate this action until August 16, 2013, plaintiff's fraud claim is time-barred.[15]

---

would help me after I missed two payments and after they screwed things up, there was such a financial mess that it was pretty hard to get disentagled from that short of continuing forward. . . . So I—you know, they represented that I had a modification, for nine months they represented that I was in this modification, and each month making things worse until they had racked up enough debt that I could not pursue anything else.  Yes, Bank of America tried several times to steer me toward an in-house proprietary loan product . . . .  But I had a HAMP modification, and I was making payments on it.  I didn't need to be steered towards something for disabled people or something with a higher interest rate or some other in-house, you know, proprietary thing.  At that point, I was—my account was so screwed up by everything they represented to me that I had no other options.

(Def. SMF Ex. B at 185:19-187:23).

[15] To the extent plaintiff is now basing her fraud claim on the theory that the mortgage recorded in the registry of deeds is a forgery, (*see* Def. SMF Ex. B at 103:19-105:20), that allegation is not contained in the operative amended complaint and is not a basis to deny summary judgment.

## IV.    <u>Conclusion</u>

For the foregoing reasons, defendant's motion for summary judgment is GRANTED as to

Counts 3, 4, 5, and 9 and DENIED as to Count 6.

**So Ordered.**


/s/ F. Dennis Saylor IV
F. Dennis Saylor, IV
Dated:  May 17, 2018                                United States District Judge